**CASE NO. 23-13467-HH**

IN THE UNITED STATES COURT OF APPEAL
FOR THE ELEVENTH CIRCUIT

PASCHA THOMAS, as Guardian and next friend of JANE DOE, a minor,

Plaintiff-Appellant

v.

CITY SCHOOLS OF DECATUR,  DR. DAVID DUDE, individually and in his
official capacity, MARCIA FOWLER, individually and in her official capacity,

Defendants-Appellees
_____

On Appeal from the United States District Court
Northern District of Georgia, Atlanta Division
Case No. 1:20-CV-02317 MHC
_____

**PLAINTIFF'S-APPELLANT'S
OPENING BRIEF**
_____

> Mary E. McAlister
> CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
> P.O. Box 637
> Monroe, VA 24574
> 770.448.4525
> mmcalister@childparentrights.org
>
> Vernadette R. Broyles
> Ernest G. Trakas
> CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
> 5805 State Bridge Rd., Suite G310
> Johns Creek, GA 30097
> 770.448.4525
> vbroyles@childparentrights.org
> etrakas@childparentrights.org
> Attorneys for Plaintiffs-Appellants

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to this Court's Local Rules 26.1-1 through 26.1-3, Appellant certifies that the name of each person, attorney, association of persons, firm, law firm, partnership, and corporation that has or may have an interest in the outcome of this action — including subsidiaries, conglomerates, affiliates, parent corporations, publicly-traded companies that own 10% or more of a party's stock, and all other identifiable legal entities related to any party in the case is limited to the following:

Broyles, Vernadette - Counsel for Appellants

Child & Parental Rights Campaign, Inc. - Counsel for Appellants

City Schools of Decatur - Appellee

Cohen, Mark – United States District Judge

Dude, David – Appellee

Fowler, Marcia – Appellee

McAlister, Mary E. - Counsel for Appellants

Thomas, Pascha - Appellant

Trakas, Ernest G. - Counsel for Appellants

Wilson, Morton, & Downs, LLC – Counsel for Appellees

Ware, Keri - Counsel for Appellees

Wilson, Robert - Counsel for Appellees

Young, Jill - Counsel for Appellees

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a), Appellant respectfully requests that oral argument be permitted in this appeal because it would assist the Court in understanding and deciding the procedural and substantive questions raised by the district court's decisions.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT ........................................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ........................................... i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF CITATIONS .................................................................................v

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES FOR REVIEW ...........................................1

STATEMENT OF THE CASE.........................................................................2

    I.    Proceedings Below ...........................................................................2

    II.    Statement of Facts ...........................................................................4

    III.    Standard of Review .......................................................................19

        A.  The Granting of Motions to Dismiss and for Summary Judgment

        Are Reviewed de novo. ...............................................................19

        B.  Decisions Regarding Management of Discovery Are Reviewed for

        Abuse of Discretion.....................................................................20

SUMMARY OF ARGUMENT .......................................................................21

LEGAL ARGUMENT ...................................................................................22

**I.    The District Court Committed Reversible Error When It Excluded From Discovery Any Information Related To Defendants' Restroom Protocol.** ..................................................................................................22

**II.    The District Court Erred In Dismissing A Portion Of Plaintiff's Title IX Claim Based On Implementation Of The Restroom Protocol.** .................26

**III.    The District Court Erred When It Ruled That Plaintiff Failed To Prove Deliberate Indifference To Support Her Title IX Claim.** ....................29

**A.  The Court exceeded its authority under Rule 56** ...............................30

**1.    The district court impermissibly weighed the evidence to favor Defendants.** ....................................................................................................31

**2.    The district court impermissibly decided factual issues.** ................34

**B.  The Court erred in concluding that there was no genuine issue of material fact regarding deliberate indifference.** .......................................36

**1. The district court's conclusion was based on improper curtailment of discovery and selective, subjective analysis of evidence.** .........................36

**2. The district court wrongly relied on the dissimilar *Adams* case instead of *Stinson*** ................................................................................................42

**3.    The district court erred in not according deference to the Office of Civil Rights' investigative findings.** ..........................................................44

iii

**IV.   The District Court Erred When It Ruled That Plaintiff Failed To Prove Intentional Discrimination And Disparate Impact To Support Her Title VI Claim.** ..................................................................46

    **A.  The District Court Erred in Disregarding Evidence Regarding Disparate Treatment/Impact.** ....................................................47

    **1.    The district court ignored established precedent when it dismissed Plaintiff's evidence of historical racism In CSD.** .......................................49

    **2.    The district court disregarded departures from norms evidencing differential treatment.** ................................................50

    **B.  The District Court Disregarded Evidence of Discriminatory Statements.** ................................................51

**CONCLUSION**.................................................................53

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENT** .....54

**CERTIFICATE OF SERVICE** .........................................................55

iv

# TABLE OF CITATIONS

## Cases

*Adams v. Demopolis City Schools*, Case No. 22-113117

    (11th Cir. September 1, 2023). ........................................................ 42-44

*Adkins v. Christie*, 488 F.3d 1324 (11th Cir. 2007)..................................................21

*Akridge v. Alfa Mut. Ins. Co.*, 1 F.4th 1271 (11th Cir. 2021) ...................... 20-24, 26

*Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, Civil Action 1:21-CV-05337

    (N.D. Ga. Oct. 26, 2023) ........................................................................52

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................30

*Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc.*, 793 F. Appx. 896

    (11th Cir. 2019) ............................................................................. 32-33

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................................................29

*Blessitt v. Retirement Plan for Employees of Dixie Engine Co.,* 848 F.2d 1164

    (11th Cir. 1988) ............................................................................. 44, 51

*Carr v. Bd. of Regents*, 249 F. App'x 146 (11th Cir. 2007) ............................ 46, 48

*Davis v. Carter*, 555 F.3d 979 (11th Cir. 2009).......................................................24

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) ..................................45

*Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394 (11th Cir. 1993) 46, 50-52

*Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313

    (11th Cir. 1990) .......................................................................................23

*Garrett v. Univ. of S. Fla.*, 824 F. App'x 959 (11th Cir. 2020)............ 24, 34, 41, 43

*Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403

  (11th Cir. 1985) .................................................................................48

*Herzog v. Castle Rock Entertainment,* 193 F.3d 1241

  (11th Cir. 1999) .......................................................... 19, 30, 34, 35, 46

*Hickman v. Taylor*, 329 U.S. 495 (1947)....................................................24

*Hill v. Cundiff,* 797 F.3d 948 (11th Cir. 2015) .........................................36

*Kentner v. City of Sanibel,* 750 F.3d 1274 (11th Cir. 2014)....................20

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ......................48

*Neitzke v. Williams*, 490 U.S. 319 (1989)..................................................27

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978).......................24

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ...................................................27

*Silva v. Bieluch*, 351 F.3d 1045 (11th Cir. 2003......................................20

*Stinson v. Maye,* 824 Fed. Appx. 849 (11th Cir. 2020) ............................44

*Subscriber Holdings, LLC v. Brightstar Corp*. No. 21-12985,

  (11th Cir. Dec. 30, 2022).....................................................................23

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264

  (11th Cir. 2013) ...................................................................................19

*Taylor v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987) .................................27

*United States v. Marengo County. Comm'n*, 731 F.2d 1546 (11th Cir. 1984) ........52

*Wright v. Sumter County. Bd. of Elections & Registration*, 979 F.3d 1282

  (11th Cir. 2020) ...................................................................................52

*Young by Young v. Montgomery County*, 922 F. Supp. 544 (M.D. Ala. 1996).......47

## **Rules**

Fed. R. Civ. P. 26(b)(1) ...........................................................................23

Fed.R.Civ.P. 56(a) ........................................................................... 19, 32

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the Complaint involved a federal question. This Court has jurisdiction over the instant appeal pursuant to 28 U.S.C. § 1291 because this is an appeal from a final decision in the United States District Court for the Northern District of Georgia granting a Motion for Summary Judgment.

The district court's order entering judgment in favor of Defendants was entered on September 20, 2023 (DE 188). Plaintiff filed her Notice of Appeal on October 19, 2023 (DE 189).

## STATEMENT OF THE ISSUES FOR REVIEW

1.    Whether the District Court committed reversible error when it excluded from discovery any information related to Defendants' restroom protocol that permitted students to access sex-separate privacy facilities based on their self-proclaimed gender identity.

2.    Whether the District Court erred in dismissing the portion of Plaintiff's Title IX claim based on implementation of the restroom protocol by selectively disregarding and misrepresenting certain allegations and analyzing the facts adversely toward, instead of in favor of, Plaintiff.

3.    Whether the District Court erred when it ruled that Plaintiff failed to prove deliberate indifference on the part of Defendants to support her Title IX claim

arising from a reported sexual assault of Plaintiff's daughter by a male classmate in the girls' restroom.

4.    Whether the District Court erred when it ruled that Plaintiff failed to prove intentional discrimination and disparate impact to support her Title VI claim.

## STATEMENT OF THE CASE

Plaintiff is appealing the district court's order granting summary judgment in favor of Defendants on Plaintiff's claims for discrimination on the basis of sex under Title IX and discrimination on the basis of race under Title VI arising from her report that her daughter, Jane Doe, age 5, was sexually assaulted by a male classmate, John Doe, in the girls' bathroom at Oakhurst Elementary School, part of the City Schools of Decatur ("CSD"). (DE187). Plaintiff is also appealing the district court's order dismissing a portion of her Title IX sexual harassment claim that addressed Defendants' implementation of a protocol permitting access to sex-separate restroom facilities based on a student's self-proclaimed gender identity. (DE 36). Finally, Plaintiff is appealing the district court's order prohibiting discovery of any information related to the District's implementation of the restroom protocol. (DE 43).

## I.    Proceedings Below

Plaintiff filed her initial Complaint on May 29, 2020. After Defendants filed a Motion to Dismiss, Plaintiff filed a First Amended Complaint (DE 17), and the

district court denied Defendants' motion to dismiss as moot. (DE 21). On March 18, 2021, the district court granted in part and denied in part Defendants' Motion to Dismiss the First Amended Complaint. (DE 36). The court granted the motion as to Count II seeking damages for violation of Title IX based on retaliation. (DE 36, 45-46). The court denied the motion to dismiss as to Count I, which sought damages for sexual harassment under Title IX. The district court parsed the order as to Count I. The court stated that Plaintiff had not alleged sufficient facts to support a Title IX claim based on Defendants' implementation of a protocol granting access to sex separate privacy facilities on the basis of gender identity. (DE 36, p. 31). The district court also said that Plaintiff had not alleged sufficient facts to state a Title IX claim based on Defendants' failure to supervise student John Doe so as to prevent him from accessing the girls' bathroom where he assaulted Jane Doe. (DE 36, p. 34). The district court found that Plaintiff had stated sufficient facts to state a Title IX claim solely as to Defendants' response to Plaintiff's report of a sexual assault. (DE 36, p. 40). The district court granted the motion to dismiss for Count III alleging violation of equal protection as to Defendant CSD and the individuals in their official capacities but denied the motion to dismiss as to the individual Defendants. (DE 36, 47-55).

On June 2, 2021, Plaintiff filed a motion seeking leave of court to file a Second Amended Complaint to add a cause of action for racial discrimination under Title

VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq., and a cause of action against Dude and Fowler for a violation of a right to be free from race discrimination under 42 U.S.C. § 1983. (DE 45). On October 7, 2021, the district court granted the motion, and the Second Amended Complaint was filed. (DE 53). After discovery was completed, Defendants filed a Motion for Summary Judgment on December 12, 2022. (DE 105). On September 20, 2023, the district court granted the Motion for Summary Judgment. (DE 187).

## II.    Statement of Facts

### Defendants Implement Restroom Protocol

In a July 26, 2016 email to CSD staff and Board members, Superintendent Dr. David Dude announced a directive ("restroom protocol") that CSD students would be permitted to access sex-separate restrooms according to each student's self-proclaimed gender identity. (Transcript of Deposition of David Dude, (DE 168[1]), p.301). The restroom protocol was put in place without notice to parents. (Transcript of Deposition of Pascha Thomas, v.1 (DE 166) 164:16-20; 165:11-22). Ms. Thomas and other District parents learned about the restroom protocol for the first time in a February 27, 2017online post by Dr. Dude. (DE 166, 164:11-165:22, DE 17, p. 14). Parents and community leaders expressed concerns about the safety risks posed by

---

[1]    DE 168 is the redacted version of the transcript. The unredacted version, DE 110, is sealed.

the protocol and the failure to inform parents about it both publicly and in meetings with Dr. Dude.  (DE 17, pp. 14-19; DE 168, 180:20-3). More than 100 parents and community leaders attended the October 10, 2017 School Board meeting to inform the Board of the safety risks and lack of transparency attendant to the protocol. (DE 17, pp. 18-19). One community leader, a former member of the parole board, warned the Board that the protocol would allow "mischievous boys" to gain access into girls' restrooms for inappropriate purposes. (DE 17, p. 19). About one month later, Ms. Thomas reported that her daughter was sexually assaulted by a male classmate in the girls' bathroom. (DE 17, pp. 23-25).

**Ms. Thomas Enrolls Her Children in CSD**

In August of 2017, Ms. Thomas and her four minor children began residing in a homeless shelter in the City of Decatur and the children were approved for McKinney-Vento eligibility to enroll in CSD. (Transcript of Deposition of Robbin Dickerson, (DE 176[2]) 15:18-17:24, 132:19-134:23, 140:5-143:13, 147:1-150:2). Jane Doe, age 5, began attending kindergarten at Oakhurst Elementary School in

---

[2]    DE 176 is the redacted version of the transcript. The unredacted version, DE 118, is sealed

2017. (DE 166[3], 26:8-10, 29:16-18). She shared a classroom with John Doe. (Transcript of Deposition of Dawn Durham, (DE 170[4]),16:21-24).

**Ms. Thomas Reports Sexual Assault of Jane Doe**

On November 17, 2017, at the start of the school day, Ms. Thomas and Jane Doe went to the school and shared in person with Dawn Durham, the nurse at Oakhurst Elementary, and Laura Deming, the school counselor, that Jane Doe had reported pain in her vaginal area the night before. (DE 166, 30:6-22; 36:17-25; 37:5-16). Ms. Thomas relayed that Jane Doe told her that during class a few days before she asked and was permitted to go to the bathroom. She reported that when she was leaving the stall in the girls' bathroom a boy was in the girls' bathroom, pushed Jane Doe up against the wall and inserted his fingers through her clothes into her vagina. (DE 166, 30:6-22; 36:16-20). Ms. Durham asked Jane Doe more specific questions, such as who did this and what happened. Jane Doe told Ms. Durham and Ms. Deming the same facts Ms. Thomas had relayed and told them the boy's name, "John Doe." (DE 166 37:8-13; 49:25-50:8).

While still at the school and having met with Ms. Durham and Ms. Deming, Ms. Thomas asked to speak to Principal Marcia Fowler. (DE 166, 38:1-11). Ms.

---

[3]    DE 166 is the redacted version of the transcript. The unredacted version, DE 108, is sealed.
[4]    DE 170 is the redacted version of the transcript. The unredacted version, DE 112, is sealed.

Durham and Ms. Deming went into Principal Fowler's office and returned to tell Ms. Thomas that Ms. Fowler was busy on a call and asked if Ms. Thomas would come back in person. (DE 166, 38:1-11). Ms. Thomas testified that she could see inside Ms. Fowler's office and saw that she was not on a call. (DE 166, 40:23 to 44:8). Ms. Thomas said she did not want to come back and would wait until Ms. Fowler was available. (DE 166, 38:1-11). After waiting 30 minutes, Ms. Thomas said she wanted to address the matter (the sexual assault of Jane Doe) with Ms. Fowler, but also had job and housing interviews. (DE 166, 43:7 to 44:11). Either Ms. Durham or Ms. Deming went into Ms. Fowler's office and said that Ms. Fowler still said she was busy. (DE 166, 43:7-25). Ms. Thomas did not want to leave without speaking with Ms. Fowler, but also needed to attend her appointments regarding housing and a job. Ms. Durham and Ms. Deming assured Ms. Thomas that Jane Doe and her sister would be safe at school so that Ms. Thomas could go to her appointments and then return to meet with Ms. Fowler. (DE 166, 43:7-25). Because of the assurances from Ms. Durham and Ms. Deming, Ms. Thomas left Oakhurst Elementary for her appointments. Ms. Thomas testified that she returned to Oakhurst around 11 a.m. or noon. She met with Ms. Fowler, social workers Dr. Melvin Ratcliff and Nicole Jefferson, Ms. Durham, and homeless liaison Robbin Dickerson. (DE 166, 46:7-12; 56:3-19). During the meeting, Ms. Thomas asked about what measures Oakhurst staff were going to take in response to the reported assault, in particular if John Doe

was going to be moved out of the same classroom with Jane Doe. (DE 166, 59:2-23). Ms. Fowler and Ms. Jefferson told Ms. Thomas that she needed to take Jane Doe to the hospital to be examined and would not agree to any measures, including moving either John Doe or Jane Doe from the classroom. (DE 166, 59:2-18 to 60:1-8; 61:5-12). Ms. Thomas told Oakhurst staff that she was already planning to take Jane Doe to be examined but wanted to know what school officials were going to do about the reported assault. Ms. Fowler and Ms. Jefferson said that it was a "school matter" and that Ms. Thomas just needed to take Jane Doe to the hospital. (DE 166, 59:2-15).

Unbeknownst to Ms. Thomas, Ms. Jefferson had filed a report with the Georgia Department of Family and Children's Services ("DFCS") regarding Jane Doe and the reported assault before the meeting with Oakhurst staff. (DE 166, 64:7-23). Ms. Thomas was therefore surprised when a DFCS worker, Benjamin Bell, showed up at Egleston hospital that evening and interviewed Ms. Thomas and her children. (DE 166, 64:7-23). DFCS opened an investigation regarding Ms. Thomas, the parent of the alleged victim but it was closed as unsubstantiated. (DE 166, 193:10-12). Dr. Ratcliff filed a report with DFCS regarding John Doe and the allegation that he had assaulted Jane Doe. (Transcript of Deposition of Melvin

Ratcliff, DE 173[5], 49:20-50:17). DFCS reported that they "screened out" the report on John Doe *i.e.,* no investigation was initiated. (DE 173, 96:6-99:5, 196:24-197:6).

### Defendants' Response to Reported Sexual Assault

After hearing about Ms. Thomas' report, Ms. Fowler contacted Bruce Roaden, Executive Director of Student Services, School Resource Officer Matthew Damico, Dr. Melvin Ratcliff, the social worker assigned to Oakhurst, and Nicole Jefferson, another social worker employed by the District. (Transcript of Deposition of Marcia Fowler, DE 169[6] 32:11-35:7, 40:13-43:8, 68:23-70:1, 79:13-19). Ms. Fowler interviewed the classroom teacher and paraprofessional and other Oakhurst staff. (DE 169, 80:7-84:11, 90:17-91:20, 95:24-96:9, 99:16-102:13). Officer Damico interviewed Oakhurst staff and asked Ms. Durham to confirm with Jane Doe which bathroom was involved. (DE 170, 13:8-14:24). The Decatur Police Department immediately determined it would not pursue criminal charges against John Doe due to his age. (DE 168, 52:9-23). According to Ms. Fowler, Mr. Roaden interviewed Ms. Fowler, Ms. Durham and the classroom teacher and paraprofessional after the school day concluded. (DE 169, 17:21-33:12, 70:4-72:9, 144:7-13). There are no

---

[5]    DE 173 is the redacted version of the transcript. The unredacted version, DE 115, is sealed.
[6]    DE 169 is the redacted version of the transcript. The unredacted version, DE 111, is sealed.

written records regarding those interviews. (DE 168, 87-88; 153:9-24; 154:16-155:2; 157:8-12).

Dr. Dude was informed of Ms. Thomas' allegation by Mr. Roaden. (DE 168, 11:2-24). Dr. Dude told Mr. Roaden to "fully investigate" Ms. Thomas' allegation of a sexual assault on Jane Doe. (DE 168, 10:15-11:19, 22:1-24:18). Dr. Dude did not give Mr. Roaden instructions regarding the investigation and does not know what steps Mr. Roaden took. (DE 168, 22:19-21). Dr. Dude did not receive a written report and there are no contemporaneous written records whether and/or how any investigation was conducted, what evidence was reviewed or what conclusions were reached. (DE 168, 87-88; 153:9-24; 154:16-155:2; 157:8-12). Dr. Dude does not recall hearing from Mr. Roaden about any milestones or discoveries concerning his investigation. (DE 168, 58:17-28). Dr. Dude claimed to "know" there was a thorough investigation solely because he asked Mr. Roaden to conduct an investigation. (DE 168, 153:9-24; 154:16 to 155:2). Dr. Dude recalled Mr. Roaden saying sometime in January or February 2018 that he (Mr. Roaden) concluded the incident reported by Ms. Thomas did not happen. (DE 168, 35:14-23). Mr. Roaden passed away in 2018. (Transcript of Deposition of Renita Walls, DE 183[7], 104:3-6). Consequently, there

---

[7]    DE 183 is the redacted version of the transcript. The unredacted version, DE 129, is sealed.

is neither testimonial nor documentary evidence to corroborate Dr. Dude's recollection of what, if any, actions Mr. Roaden took.

**Ms. Thomas' Efforts To Elicit A Response from Defendants**

Beginning on November 27, 2017, the first day of school after Thanksgiving break, Ms. Thomas began calling Oakhurst Elementary School to speak to Ms. Fowler to get answers about how the school was going to guarantee her daughter's safety. (DE 166, 84:7-85:13). Ms. Thomas did not return Jane Doe (or her older sister) to Oakhurst Elementary until December 8, 2017 because she was concerned about her daughters' safety following the assault in the girls' bathroom. (DE 166, 80:5-15; 84:4 to 85:1). Other than a check-in call from Ms. Dickerson, there was no communication from Oakhurst Elementary or CSD staff during Thanksgiving break regarding how Jane Doe was doing or how the school was going to keep Jane Doe safe. (DE 166, 105:9-106:3). After the break, Ms. Thomas called the school once a day for three days and left messages for Ms. Fowler with the school receptionist. (DE 166, 84:7-85:1). For the next couple of days, Ms. Thomas called the school three or four times a day asking to speak to Ms. Fowler and was repeatedly told Ms. Fowler was busy or on a call or in a meeting, and again left messages asking that Ms. Fowler return her calls. (DE 166, 84:7-85:1). Ms. Fowler did not return Ms. Thomas' calls. (DE 166, 84:7-85:1; DE 176, 72:11-19).

Ms. Thomas' called the CSD Central Office to speak with Dr. Dude or Mr. Roaden but those calls also went unanswered. On December 5 and 6, 2017, Ms. Thomas went to the CSD central office to try to speak with Dr. Dude or Mr. Roaden in person regarding the reported sexual assault, concerns for her daughters' safety and request for a transfer. (DE 176, 75:4-18; DE 166, 100:2-101:7). Ms. Thomas waited in the office both days but neither Dr. Dude nor Mr. Roaden would speak with her. (DE 176, 78:2-17). In fact, there is no evidence that either Dr. Dude or Mr. Roaden ever spoke with Mrs. Thomas. (DE 168, 64:22-23).

On December 7, 2017, after multiple telephone messages left with receptionists at both the school and the central office were not returned, and two days of waiting at the central office without seeing Dr. Dude or Mr. Roaden, Ms. Thomas received a notice on her door that Dr. Ratcliff and Ms. Jefferson had come to her home about her daughters not being in school and that the district would be contacting DFCS if Ms. Thomas did not respond. (DE 166, 85:23-86:4; DE 173, 122:24-124:2). On December 7, 2017, Ms. Thomas again called Oakhurst Elementary and was again told that Ms. Fowler was not available. (DE 166, 86:1-24; 104:4-9). Ms. Thomas told the receptionist that if Ms. Fowler did not return her call, then Ms. Thomas would contact the media about the district's failure to keep her daughters safe or provide them with an education. (DE 166, 86:1-24; 104:4-9).

Ms. Fowler returned Ms. Thomas' call that day and scheduled a meeting for the next day, December 8, 2017. (DE 166, 86:1-24).

Ms. Fowler met with Ms. Thomas, Christa Smith, a community advocate for Ms. Thomas, Dr. Ratcliff, and Assistant Principal Jean-Jacques Credi on December 8, 2017. (DE 166, 93-94; DE 173, 126:10-14). During that meeting, Ms. Thomas asked, "So what have you achieved as far as in (sic) having some new information as far as how you're going to make sure that my child is going to be safe here?" "Are you going to take him out of the -- remove him (John Doe) out of the classroom?" Ms. Fowler replied, "I'm not removing anyone." (DE 166, 95:7-12). Ms. Fowler later agreed to move only Jane Doe, the victim of the assault, to another classroom. (DE 166, pp. 117-118). Because they refused to move John Doe, Ms. Thomas agreed to the move, and Jane Doe returned to school on December 8, 2017. (DE 166, 133:21-23).

### The District Publicly Denies The Sexual Assault Occurred

As early as November 19, 2017, Ms. Jefferson, who had not spoken to Ms. Thomas except as part of a group meeting, was stating that she did not believe the alleged sexual assault reported two days earlier had actually occurred. (Transcript of Deposition of Nicole Jefferson, v.1 DE 171[8], 129:4-130:3; 230-233). In a text

---

[8]    DE 171 is the redacted version of the transcript. The unredacted version, DE 113, is sealed.

exchange with DFCS employee Ben Bell, Ms. Jefferson said, "I didn't believe the story when she reported to us on Friday. I don't believe this incident even happened." (DE 171, pp. 230-233). Ms. Jefferson had not spoken with Jane Doe at all and had interacted with Ms. Thomas only in a group meeting yet agreed with a text message Mr. Bell made saying that Jane Doe had been "coached" by Ms. Thomas regarding the report of an assault. (DE 171, 135:1-20; 230-233). By contrast, Mr. Bell had at least interviewed Ms. Thomas and her children before he offered his opinion on November 19, 2017 that the children had been "coached." (DE 171, pp. 230-233).

Dr. Dude testified that he did not receive an oral report from Mr. Roaden regarding his review of Ms. Thomas' report until January or February 2018. (DE 168, 35:14-23). Nevertheless, on November 29, 2017, Dr. Dude responded to a concerned father's question about "rumors" of a sexual assault in a bathroom at Oakhurst Elementary by asserting that the "rumor" was not true. (DE 168, 113-116; 304-308).

Similarly, knowing that the Decatur Police Department ("DPD") had immediately decided not to prosecute because of John Doe's age, and without knowing whether Mr. Roaden or DFCS had completed any investigations, let alone whether they had reached a conclusion about whether the alleged assault had occurred, on February 8, 2018 Ms. Fowler issued a public statement asserting that "a thorough investigation involving Oakhurst administrators, central office staff, law

enforcement, and social service agencies led us to confidently determine that the allegation was unfounded." (DE 169, 235; 240-244; 350). Ms. Thomas was not provided with any information regarding the purported investigations or conclusions but only heard about the denial later when the February 8, 2018 public statement was released. (DE 166, 170:2-10; 172:11-19).

Two childhood sexual abuse experts concluded that the assault did occur after interviewing and evaluating Jane Doe. Dr. Laura Medlin, Ph.D. conducted a forensic interview of Jane Doe on January 23, 2018, and concluded that Jane Doe's statements and test results were consistent with sexual abuse. (Transcript of Deposition of Laura Medlin DE 178[9], 179:1-4; 229). Dr. Nancy Aldridge, Ph.D. conducted a forensic trauma evaluation and concluded that Jane Doe had been "sexually abused" and it was significant in her mind. (Transcript of Deposition of Nancy Aldridge, DE 179[10],  263:14-22;357). Dr. Aldridge also testified "I believe that I can say with the amount of clinical certainty, medical certainty that we have in rendering an opinion in cases like this that what (Jane's) experiencing was directly related to the sexual abuse at school." (DE 179, 269:23 to 270:2).

---

[9]     DE 178 is the redacted version of the transcript. The unredacted version, DE 120 is sealed.
[10]     DE 179 is the redacted version of the transcript. The unredacted version, DE 121, is sealed.

15

**OCR Concludes That CSD Violated Title IX.**

On June 1, 2018, Ms. Thomas filed a complaint with the Office of Civil Rights of the U.S. Department of Education ("OCR") against CSD for subjecting Jane Doe to sex discrimination in connection with the sexual assault. OCR enforces Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. §§ 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106. Following an extensive 18-month-long investigation of Ms. Thomas' report on June 19, 2020, OCR issued its findings that CSD had violated Title IX by failing to provide a prompt and equitable response to Ms. Thomas' report of a sexual assault in violation of 34 C.F.R. §§106.8 and 106.81. (OCR Findings, DE 17-1, p. 12). OCR's investigation revealed:

> Although the District immediately started to respond to the Parent's Report by asking staff to memorialize the Report in written statements and interviewing the Teacher and the Paraprofessional, the District then took no further steps to determine what occurred. Instead, the District involved and deferred to the SRO and DFCS. The District did not resume investigating when the SRO indicated there would be no further criminal processing due to the age of the children, and the District failed to ascertain anything about DFCS's findings concerning the alleged incident.

(DE 17-1, p. 12). "The District's failure to respond appropriately in light of these alleged bathroom incidents is particularly concerning given the District's implementation of the Policy (the restroom protocol)." (DE 17-1, p. 12).

> The District's approach allows children of different biological sexes to mix in the bathrooms, an area where students may engage in misconduct out of sight of adult supervision. Given the serious nature of the reports of harassment reportedly occurring in school bathrooms,

one might have anticipated the District would be extra vigilant in providing a proper response under Title IX. Instead, OCR found no evidence that the District assessed the existence of sexual harassment despite the incident reflected in the Report, the concerns of parents expressed in the aftermath of the Report, and the allegations that Student 1 [John Doe] had been harassed in the boys' bathroom.

(DE 17-1, p. 12).

**Evidence of Racial Inequality at CSD.**

In December 2016, Dr. Dude provided a report on disproportionality in CSD at a School Board meeting. (DE 168, 318-332). Dr. Dude reported that CSD had been experiencing troubling race-based disparities in academic achievement and discipline for a number of years. (DE 168, 318-332). The report showed, *e.g.,* that a Black child was 8 to 11 times more likely to be cited for discipline problems than was a White child. (DE 168, 318-322).

The School Board hired a consulting firm to perform an Equity Assessment to study race-based disparities in academics, discipline, extracurricular activities, and other aspects of the CSD community. (DE 168, 196:21-197:12). The consulting firm identified differences between how African-American students and white students and their parents were treated. (DE 168, 198:13-19). Community members, teachers at all levels, administrators in the high school and middle school and students reported racial disproportionately in enforcement of discipline. (DE 168, 200:9-15). Data collected by the firm showed that more than 60 percent of behavioral incidents involved black or African-American students, who comprised 22 percent

17

of the student population, while 26.5 to 32.1 percent of behavioral incidents involved

white students, who comprised 63 percent of the student population. (DE 168, 199:8-

201:12). The report also found that students and their parents were treated differently

based on their living situation. (DE 168, 202-205).

Dr. Dude's July 16, 2016 message announcing the restroom protocol included

an analogy regarding race:

> In evaluating a particular circumstance, I encourage you to consider
> questions and statements regarding transgender students from the
> perspective of other groups for which our country has struggled with
> civil rights (and still does). For instance, if asking yourself, [s]hould I
> allow this transgender student to use this restroom? consider replacing
> "transgender" with "**black,**" "disabled," or "**low income**" and the
> answer becomes clear (in case it wasn't before).

(DE 168, 301) (emphasis added). Minority parents reported to Dr. Dude that they

found the comparison inappropriate. (DE 168, 181:19-23, 335-337). Dr. Dude

disagreed with the parents' assessment. (DE 168, 182:8-13).

In her text exchange with Mr. Bell on November 19, 2017, Ms. Jefferson

stated:

> This is why I informed the homeless liaison at our schools to be careful
> about believing some of these families. They are all not really homeless
> just looking for a quick come up to sue and get some money.

(DE 171, 138:2- 139:17;230-233). At the time, 100 percent of homeless families in

CSD consisted of African-American children and African-American parents. (DE

176, 179:2 to 180:2). The student population of City Schools of Decatur between 2013 and 2018 was majority white. (DE 176, 180:3-6).

Ms. Dickerson observed and experienced differential treatment of African-American families vis-a-vis white families by CSD staff during her tenure which ended in 2018. (DE 176, 228:20 to 229:1). Ms. Dickerson observed that preference was given to Caucasian children over African-American children at City Schools of Decatur, including her own African-American son. (DE 176, 229:22 to 230:2). Former lead nurse Renita Walls also testified that Mr. Roaden, whom Dr. Dude tasked with investigating Ms. Thomas' allegations, treated white and non-white children seeking accommodations under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. differentially. (DE 183, 71:25-75:15).

## III.   Standard of Review

### A. *The Granting of Motions to Dismiss and for Summary Judgment Are Reviewed de novo.*

This Court reviews the granting of a Motion for Summary Judgment *de novo*. *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). *Id.*

The moving party bears the burden of meeting this standard. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999) (per curiam). In assessing

whether the movant has met this burden, the court should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* All reasonable doubts about the facts should be resolved in favor of the non-movant. *Id.* If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Id.* "Summary judgment may be inappropriate even where the parties agree on the basic facts but disagree about the inferences that should be drawn from these facts." *Id.* "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Id.*

This Court also reviews the district court's dismissal of an aspect of the First Cause of Action of Plaintiff's' First Amended Complaint under F.R. Civ. P 12(b)(6) *de novo*. *Kentner v. City of Sanibel,* 750 F.3d 1274, 1278 (11th Cir. 2014). As is true for review of Rule 56 motions, the complaint is viewed in the light most favorable to Plaintiff and the well-pleaded factual allegations are accepted as true. *Silva v. Bieluch*, 351 F.3d 1045, 1046 (11th Cir. 2003).

### B. Decisions Regarding Management of Discovery Are Reviewed for Abuse of Discretion.

This Court reviews the district court's management of discovery for abuse of discretion. *Akridge v. Alfa Mut. Ins. Co.*, 1 F.4th 1271, 1276 (11th Cir. 2021). "A district court abuses its discretion when it applies an incorrect legal standard, employs improper procedures, makes findings of fact that are clearly erroneous, or

20

commits a clear error of judgment." *Id.* While district courts have broad discretion in fashioning discovery rulings, their discretion is not absolute. *Id.* Courts are bound to adhere to the liberal spirit of the Federal Rules. *Id.* Therefore, discovery rulings "are not entirely sacrosanct" and if the district court "fails to adhere to the liberal spirit of the Rules, we must reverse." *Id.* (citation omitted).

That was the outcome in *Akridge* and *Adkins v. Christie*, 488 F.3d 1324, 1330 (11th Cir. 2007). In *Akridge*, this Court found that the district court erred in denying the plaintiff's motion to compel the deposition of a company executive. 1 F.4th at 1277. This Court found that there was no evidence of bad faith, no intent to annoy, embarrass or oppress the executive or that the deposition would have touched on privileged or irrelevant material. *Id.* Similarly, in *Adkins*, this Court concluded that the district court erred in denying discovery related to other physicians at plaintiff's former employer and incidents dating back more than five years on the grounds that they were irrelevant to his employment discrimination claim. 488 F.3d at 1331.

## SUMMARY OF ARGUMENT

The district court wrongly denied Ms. Thomas the opportunity to seek justice for her daughter following a sexual assault at the age of 5 by a male classmate allowed in the girls' restroom at CSD's Oakhurst Elementary School. She was deprived of the right to conduct discovery on a critical known circumstance, *i.e.,* CSD's decision to permit students to access restrooms according to a self-

proclaimed gender identity instead of their sex, which permitted males to access the girls' bathroom with impunity. Even with that impermissible restriction, Ms. Thomas provided evidence of deliberate indifference on the part of Defendants in responding to her report of a sexual assault, raising a triable issue of fact for her claim that Defendants violated Title IX. Ms. Thomas' evidence was buoyed by OCR's Findings, following an 18-month investigation, that Defendants had violated Title IX.

Nevertheless, the district court granted Defendants' motion for summary judgment, brushing aside the OCR Findings, disregarding significant evidence supporting the presence of deliberate indifference, and selectively citing evidence favoring Defendants' position. The district court similarly erred in dismissing Ms. Thomas's Title VI claim by disregarding certain evidence and interpreting the rest in Defendants' favor. The numerous errors in the district court's decision require reversal.

## LEGAL ARGUMENT

I.    **The District Court Committed Reversible Error When It Excluded From Discovery Any Information Related To Defendants' Restroom Protocol.**

The district court's decision is fatally flawed by its impermissible curtailment of Ms. Thomas' access to full discovery. *See Akridge,* 1F.4th at 1273. Plaintiff was denied the ability to obtain affirmative evidence showing a genuine issue of material fact to defeat summary judgment before discovery began: "Because Plaintiff has

22

failed to sufficiently allege deliberate indifference as it relates to CSD's implementation of the sex-separate bathroom policy, discovery as to the discussion, implementation, or impact of the directive will not be permitted in this case." (DE 43, p. 2). In *Akridge*, the court's improper limitation of discovery led to the plaintiff's disability discrimination claim being dismissed on summary judgment because she "presented insufficient evidence to create a genuine issue of material fact about whether there was an intent to discriminate." 1F.4th at 1273. Similarly, here, the district court's improper limitation of discovery led to Ms. Thomas' sex discrimination claim being dismissed on summary judgment because she failed to cite to "evidence by which a reasonable jury could find that CSD acted with deliberate indifference." (DE 187, pp. 35-36). In *Akridge*, this Court reversed the grant of summary judgment because the plaintiff was denied full discovery. *Id.* The same is true here.

This Court has long established, in keeping with Supreme Court precedent, that "(b)efore entering summary judgment the district court must ensure that the parties have an adequate opportunity for discovery." *Subscriber Holdings, LLC v. Brightstar Corp*. No. 21-12985, at *14-*15 (11th Cir. Dec. 30, 2022) (citing *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir. 1990). The question of whether a party has had an adequate opportunity for discovery must be answered in the context of the Supreme Court's longstanding directive that

discovery rules must be construed liberally to allow for robust discovery. *Akridge,* 1 F.4th at 1276-77 (citing *Hickman v. Taylor*, 329 U.S. 495, 506-507 (1947)). Fed. R. Civ. P. 26(b)(1) provides: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case(.)" Relevance in the context of discovery "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Akridge,* 1F.4th at 1276 (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). "Since the Rules 'strongly favor full discovery whenever possible,' a civil litigant is generally entitled to 'any information sought if it appears reasonably calculated to lead to the discovery of admissible evidence.'" *Id.* (citations omitted). Accordingly, information "need not be admissible in evidence to be discoverable." *Id.*

Here, after prohibiting discovery related to Defendants' restroom protocol, the district court concluded that Ms. Thomas failed to cite to "evidence by which a reasonable jury could find that CSD acted with deliberate indifference." (DE 187. pp. 35-36). A school is deliberately indifferent where its response, or lack thereof, to student-on-student harassment or discrimination is "clearly unreasonable" in the light of "**known circumstances**." *Garrett v. Univ. of S. Fla. Bd. of Trustees*, 824 F. App'x 959, 964 (11th Cir. 2020) (quoting *Davis v. Carter*, 555 F.3d 979, 983 (11th Cir. 2009)) (emphasis added). Consequently, in order to demonstrate that

24

Defendants were deliberately indifferent, Plaintiff had to provide evidence of the "known circumstances" at the time of Defendants' actions in order to establish that Defendants acted clearly unreasonable. *Id.*

The "known circumstances" under which Defendants made their decisions necessarily included information related to the discussion, implementation, and effects of Defendants' restroom protocol that permitted children to choose sex-separate restrooms on the basis of their gender identity, rather than their sex. With that protocol in place, a boy such as John Doe was permitted to use the girls' restroom without adverse consequences if he identified as a girl. (DE 166, 165:25-166:11). The fact that John Doe could follow Jane Doe into the girls' bathroom without question is necessarily a factor, *i.e.*, "known circumstance" in determining whether Defendants acted unreasonably in their response to Ms. Thomas' report that John Doe assaulted Jane Doe in the girls' bathroom. How decisionmakers arrived at the decision to implement the protocol— *e.g.,* what studies, experts, and government guidelines were consulted, what community concerns were publicly raised, and the analysis and discussion of those information and concerns—is "nonprivileged matter that is relevant to Plaintiff's claim" that Defendants' response to Plaintiff's report of sexual harassment violated Title IX. Fed. R. Civ. P. 26. Implementation of the protocol is a "matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case," *i.e.,* whether Defendants acted

25

unreasonably in what they did and failed to do in response to Ms. Thomas' report. *Akridge,* 1 F.4th at 1276. The reported sexual assault is itself an "impact" of the protocol. To deny discovery on the protocol, therefore, is a self-defeating proposition that became a self-fulfilling prophecy for denial of relief.

The district court prevented Ms. Thomas from obtaining that information, and then penalized her for not offering sufficient evidence to establish that Defendants' acts and omissions were clearly unreasonable. As was true in *Akridge*, the district court abused its discretion and committed reversible error when it prohibited discovery related to Defendants' restroom protocol. Consequently, the order granting summary judgment must be vacated.

## II.    The District Court Erred In Dismissing A Portion Of Plaintiff's Title IX Claim Based On Implementation Of The Restroom Protocol.

The district court's erroneous exclusion of information regarding the restroom protocol from discovery arose from its equally problematic partial granting of Defendants' Motion to Dismiss the First Cause of Action in the First Amended Complaint. (DE 36, p. 31). The district court permitted the Title IX claim to proceed, but only after it significantly restricted its scope so that CSD's restroom protocol would not be considered. (DE 36, pp. 28-42). The district court exceeded its authority under Rule 12b(6) by interjecting personal judgments regarding the believability of the allegations, selectively disregarding certain allegations and failing to analyze the allegations it did consider in a light most favorable to Plaintiff.

26

The issue in the Rule 12b(6) motion, as opposed to the Rule 56 motion for summary judgment, is not whether Plaintiff will ultimately prevail, but whether she is entitled to offer evidence to support the claims. *Taylor v. Ledbetter*, 818 F.2d 791, 793-94 (11th Cir. 1987) (*en banc*) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "It may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer,* U.S. at 236. A motion to dismiss also is not decided based on a judge's disbelief of a complaint's factual allegations. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). "District court judges looking to dismiss claims on such grounds must look elsewhere for legal support." *Id.* In passing on a motion to dismiss, the allegations of the complaint should be construed favorably to the pleader. *Taylor*, 818 F.2d at 794 n.4. The district court failed to do so.

Instead of objectively reviewing the allegations of the Complaint related to the restroom protocol in the light most favorable to Plaintiff, the district court analyzed Plaintiff's allegations from a perspective of disbelief of, or disagreement with, the factual allegations and/or belief that proof of the facts was improbable. "Portions of the First Amended Complaint contain allegations which are more in the nature of a political discussion about the merits of gender identity educational policies than about the relevant facts in this case. *See, e.g.,* First Am. Compl. ¶¶ 15-16, 32-33, 38." (DE 36 p. 2 n.2). The paragraphs in question, however, recited

27

relevant historical facts regarding governmental directives related to gender-identity based access to school privacy facilities (DE 17, p. 7), which were the basis for Defendants' protocol, events related to those directives (DE 17, pp. 13-14), and public input related to the restroom protocol during a school board meeting just one month before the assault. (DE 17, p. 15). The cited paragraphs were not "political discussion(s)" regarding the merits of gender identity policies, but recitations of historical facts and events relevant to Defendants' implementation of the bathroom protocol that enabled males to be present in the girls' bathroom with females. Plaintiff's allegations that Defendants were creating an unsafe education environment by approving the protocol even after receiving public testimony about its potential dangers, accepted as true and viewed in the light favorable to Plaintiff, described notice of risk received and ignored by Defendants. (DE 17, p. 53). However, the district court erroneously characterized the allegations as "limited to the 'wisdom' of the Policy or CSD's awareness of parental objections to it, neither of which support a finding of deliberate indifference." (DE 36, p. 29). There were, however, no subjective allegations regarding Plaintiff's view of the "wisdom" of the protocol – but rather, recitations of the warnings and concerns actually voiced by members of the community. (DE 17, pp. 18-19).  Even if there were, that would not negate the fact that the allegations included statements received that put Defendants on notice shortly before the assault in question that their restroom protocol, if not

withdrawn or revised, posed a risk of sexual harassment and assault. (DE 17, pp. 18-19).

Only by treating Plaintiff's allegations as false and viewing them in a light unfavorable to Plaintiff could the district court conclude that "(n)one of Thomas's allegations, nor any reasonable inference therefrom, show that CSD was sufficiently alerted 'to the possibility of (Jane Doe's) sexual harassment,'" or that "Thomas's allegations do not indicate the existence of a 'risk of such conduct that the Title IX recipient has the duty to deter.'" (DE 36 at 33). The court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable" or "recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). That is precisely what the district court did here, and it resulted not only in an incorrect dismissal of a portion of Plaintiff's Title IX claim, but also the improper restriction on discovery discussed *supra*.

## III.    The District Court Erred When It Ruled That Plaintiff Failed To Prove Deliberate Indifference To Support Her Title IX Claim.

After erroneously prohibiting Ms. Thomas from obtaining evidence regarding a critical "known circumstance," the district court denied her relief under Title IX because she failed to provide sufficient evidence to demonstrate that Defendants acted unreasonably in light of the "known circumstances." (DE 187, p. 31). The district court's conclusion that Ms. Thomas could not establish that Defendants were deliberately indifferent to her report of a sexual assault was not only disingenuous

29

but also built upon flawed procedural and substantive premises demonstrative more of a predetermined outcome than objective analysis. As was true with its earlier dismissal of the restroom protocol issue, in its granting of summary judgment to Defendants, the district court exceeded its authority by refusing to consider and misrepresenting relevant evidence. The district court also ignored binding relevant precedent in favor of a dissimilar case and failed to accord sufficient deference to the findings of the OCR investigation.

### A. The Court exceeded its authority under Rule 56

The district court properly quoted but then failed to adhere to the appropriate standards for its analysis under Rule 56. In balancing the relative responsibilities of the court and jury for purposes of motions for summary judgment, the Supreme Court said, "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* This Court has explained: "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog*, 193 F.3d at 1246. "Summary judgment may be inappropriate even where the parties agree on the basic facts but disagree about the inferences that should be drawn from

30

these facts." *Id.* "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Id.*

### 1. *The district court impermissibly weighed the evidence to favor Defendants.*

The district court improperly engaged in credibility determinations in how it assessed Plaintiff's testimony versus Defendants' testimony and in the inferences drawn. For example, in rejecting Ms. Thomas' challenge to Defendants' contention that no one from CSD interviewed Jane Doe, the district court said:

> Thomas presents no evidence (**other than her own testimony** that Durham asked Jane Doe questions during their morning meeting) to contradict the testimony offered by Defendants that, aside from Durham's inquiry about the location of the restroom, there were no other inquiries made of Jane Doe on November 17 regarding the Incident by school officials.

(DE 187, p. 6, n.7) (emphasis added). The district court clearly made a credibility determination, finding Ms. Thomas' deposition testimony taken under oath was somehow not credible enough to contradict deposition testimony from Defendants on the same subject.

` The district court also dismissively rejected Ms. Thomas' objections to declarations Defendants created to counter Ms. Thomas' testimony as part of Defendants' Reply to the Motion for Summary Judgment. (DE 187, p. 6, n.7). Dismissing Ms. Thomas' objections to the post hoc, self-serving declarations, the district court proclaimed that it was permitted to consider them. (*Id.*). "(T)he Court

is within its discretion to consider declarations, especially if the statements are unopposed by any other portion of the record." (*Id.*). However, some of the statements in the declarations were opposed by sworn testimony. For example, in her reply Declaration, Ms. Durham said:

> Ms. Thomas made this report to myself and school counselor Laura Deming, and then left the school, stating that she had an appointment in downtown Atlanta. We tried to persuade Ms. Thomas to stay, explaining that the situation was very serious, that there was a process that must be followed in which the school would have to investigate and that we had to notify the school social worker. (Declaration of Dawn Durham, DE 106-20, p. 2).

However, Ms. Thomas testified:

> Ms. Durham and Ms. Deming went into Principal Fowler's office and returned to tell Ms. Thomas that Ms. Fowler was busy on a call and could Ms. Thomas come back. (DE 166, 38:1-11). Ms. Thomas could see inside Ms. Fowler's office and saw that she was not on a call. (DE 166, 43:23 to 44:8). Ms. Thomas said she did not want to come back and would wait. (DE 166, 38:1-11).

In her reply Declaration Ms. Durham further stated:

> When school resumed on November 27, 2017, following Thanksgiving break, Jane and her sister were absent for a number of days. The school secretary called Ms. Thomas multiple times during this period to notify her that the girls had been absent and try and determine when they would return to school. (Durham Declaration, DE 106-20, pp 4,5).[11]

---

[11]    This statement should also have not been considered because it was not based on personal knowledge. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). *Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc.*, 793 F. Appx. 896, 902 (11th Cir. 2019).

This stands in opposition to Ms. Thomas' testimony that:

> Beginning on November 27, 2017, the first day of school after Thanksgiving break, Ms. Thomas began calling Oakhurst Elementary School to speak to Ms. Fowler to get answers about how the school was going to guarantee her daughter's safety. (DE 166, 84:4-85:13) …. Ms. Fowler did not return Ms. Thomas' calls. (DE 166, 84: 4-85:1)

The district court further erred in relying on declarations submitted as part of the reply because they represented new evidence to which Ms. Thomas did not have an opportunity to respond with contrary evidence. *Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc.*, 793 F.Appx. 896, 902 (11th Cir. 2019). "Because summary judgment is a final disposition on the merits, courts should not grant summary judgment based on arguments or evidence to which the nonmoving party has not had a reasonable and meaningful opportunity to respond with contrary argument or evidence." *Id.* "Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond." *Id.* When faced with a reply brief that offers new evidence, the district court has two permissible courses of action, either (1) permit the nonmoving party to file a sur-reply or (2) refrain from relying on any new material contained in the reply brief." *Id.* As was true in *Atlantic Specialty*, the district court failed to do either with regard to the declarations filed as part of the reply. Therefore, its conclusion that it was permitted to consider those declarations to counter Ms. Thomas' testimony was clear error.

## 2. The district court impermissibly decided factual issues.

Contrary to this Court's precedent, on a number of occasions the district court decided factual issues instead of denying the motion and proceeding to trial. *See Herzog,* 193 F.3d at 1246. ("If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."). For example, the district court decided that a direct conflict in testimony between Ms. Thomas and Ms. Fowler regarding Ms. Fowler's response to Ms. Thomas' report was not material:

> The parties dispute who took the lead in having the meeting scheduled. Thomas asserts that she called Fowler the same day Ratcliff left the notice on her door, asked to speak to Fowler, and told the receptionist she would "call the news" if Fowler did not return her call, and that Fowler then called back to say she was open to having a meeting. Thomas Dep. I at 86, 89. Fowler denied receiving any messages that Thomas was attempting to call her and would have followed up if Thomas had done so. Fowler Dep. at 205-06, 210. Given that all parties agree that the meeting was scheduled, the Court does not find that this to be a dispute of any material fact.

(DE 187, p. 17 n.16). Given that the question of whether Defendants' response to Ms. Thomas' report of a sexual assault was "unreasonable in light of the known circumstances" is the key determinant of whether Defendants were deliberately indifferent, *Garrett*, 824 F. App'x at 964, the issue of whether Ms. Fowler ignored Ms. Thomas' phone calls for several days or promptly returned them is necessarily a material fact. The dispute between the parties on Ms. Fowler's response should have triggered a denial of summary judgment.

34

The district court also decided material issues regarding the existence and efficacy of Defendants' investigation instead of acknowledging that the disputes between the parties required denial of the motion. In so doing, the district court also violated the requirement under Rule 56 that all factual inferences must be viewed in the light most favorable to the party opposing the motion and all reasonable doubts resolved in favor of the non-movant. *Herzog,* 193 F.3d at 1246. The district court acknowledged that there was no written or direct testimonial evidence regarding whether and how Mr. Roaden conducted his investigation. (DE 187, p.20). The court also acknowledged that OCR had determined that Defendants' response to the report violated Title IX. (DE 187, p.35). Nevertheless, the district court concluded, "there is undisputed evidence in the record that CSD staff were interviewed about the Incident, an investigation was conducted, and a determination was made that the sexual assault did not occur." (DE 187, p. 35). Such a conclusion is only possible if the court disregarded the dearth of evidence regarding CSD's internal investigation.

The district court's conclusion that "undisputed evidence shows an investigation was conducted" wholly ignores the absence of credible evidence regarding Mr. Roaden's purported investigation. There are no contemporaneous written records regarding how any investigation was conducted, what evidence was reviewed or what conclusions were reached. (DE 168, 87-88; 153:9-24; 154:16-155:2; 157:8-12). When asked how he knew Mr. Roaden, who died in 2018,

conducted a thorough investigation, Dr. Dude testified, "Mr. Roaden told me he completed the investigation, and to me that is knowledge that a thorough investigation had been done." (DE 168, 154:16 to 22). Dr. Dude's impressions based on an uncorroborated hearsay statement does not satisfy the standards for admissible evidence under the Federal Rules.

### B. The Court erred in concluding that there was no genuine issue of material fact regarding deliberate indifference.

The district court's errors in excluding key information from discovery, exceeding its authority under Rule 56, and selectively analyzing evidence to favor Defendants were compounded by its reliance on dissimilar precedent to the exclusion of relevant authority and its failure to accord any deference to OCR's eighteen-month investigation finding that Defendants violated Title IX. That conglomeration of errors resulted in the fatal error of ruling that "Thomas has failed [to] cite to evidence by which a reasonable jury could find that CSD acted with deliberate indifference in response to any known acts of discrimination or harassment with respect to Jane Doe." (DE 187, 35-36).

### 1. The district court's conclusion was based on improper curtailment of discovery and selective, subjective analysis of evidence.

The district court cited only selective evidence, drew inferences in favor of Defendants, and analyzed only one of the factors necessary for a Title IX student-on-student sexual harassment claim under *Hill v. Cundiff,* 797 F.3d 948, 970 (11th

Cir. 2015), *i.e.*, deliberate indifference, to dismiss Ms. Thomas' Title IX claim. (DE 187, pp. 28-36). The district court cherry-picked facts that supported Defendants' version of the circumstances, disregarded significant evidentiary gaps and dismissed as immaterial contradictory evidence that created genuine issues of material fact. (DE 187, pp. 28-36).

The court claimed that "the undisputed evidence, with all reasonable inferences drawn in Thomas's favor, belie her argument" that there is a genuine issue of material fact regarding whether there was an investigation. (DE 187, p. 28). However, it is the court's argument that there is no genuine issue of material fact which is belied by its selective recitation of evidence with all reasonable inferences drawn in Defendants' favor. The court wrongly concludes that "CSD conducted an immediate investigation into Thomas's allegations and affirmatively took steps to ensure that Jane Doe would be protected from any contact by John Doe" (DE 187, p. 30) based on the following:

> The undisputed evidence shows that, on the same day that Thomas reported the Incident to Durham and Deming: (1) Durham and Doming (sic) notified Fowler about the report of the Incident; (2) Fowler informed Roaden of the allegations; (3) Officer Damico and the CSD social workers were contacted to report the Incident; (4) Damico collected statements from Oakhurst personnel; (5) Fowler interviewed Jane Doe's teacher and paraprofessional to determine when the assault could have occurred and if they noticed any unusual behavior from either Jane or John Doe; (6) Fowler instructed them to ensure that both Jane Doe and John Doe were supervised when going to the bathroom; (7) Fowler discussed with the CSD social workers what steps should be taken with respect to John Doe; (8) the CSD school social workers filed

37

reports to refer the matter, which involved an allegation of sexual abuse, to DFCS to secure support and services for both students; (9) CSD staff encouraged Thomas to take Jane Doe to the hospital for an evaluation; and (10) Roaden conducted interviews of CSD staff after students left for the day. CSD was informed thereafter that DFCS had opened an investigation into the Incident, and Dickerson reached out to Thomas over the Thanksgiving break to offer support and services for her children.

(DE 187, pp. 28-29). According to the district court, Defendants fulfilled their obligation to investigate an allegation of a 5-year-old girl being sexually assaulted by a male student in the girls' restroom by informing Central Office staff, Decatur Police and DFCS, taking statements from selected employees, telling teachers to supervise bathroom use, having a discussion with social workers, and encouraging Ms. Thomas to do what she already decided to do, *i.e.*, take Jane Doe to the hospital for an evaluation. (DE 166, 59:2-15).

Even if the court's listing of Defendants' actions were complete and accurate (which they are not), and inferences were properly drawn in favor of Ms. Thomas, there would be no support for the court's conclusion that "Thomas has failed cite to evidence by which a reasonable jury could find that CSD acted with deliberate indifference." (DE 187, p. 35). The fact that the court disregarded or discounted as immaterial contrary evidence favoring Ms. Thomas makes its conclusion even more invalid.

The court's claim that DFCS "opened an investigation into the Incident" is not supported by the evidence. DFCS did not open any investigation as a result of

the report filed by Mr. Ratcliff related to the alleged perpetrator of the Incident, John Doe. (DE 173, 96:6-99:5, 196:24-197:6). As for the report filed by Ms. Jefferson, expert Tom Rawlings, the former statewide Director of DFCS, testified that investigation did not address the alleged child-on-child sexual assault because it could not. (Transcript of Deposition of Thomas Rawlings DE 184[12], 166:8-23; DE 184-1, pp. 24-27). DFCS's statutory mandate is to investigate allegations of child abuse by adult caregivers. (DE 184-1, pp. 24-27). DFCS has no authority to investigate allegations of child abuse committed by another student – those are to be investigated by law enforcement and the school in which they occur. (*Id*). Instead of investigating the sexual assault, or as Ms. Jefferson and the court claimed, providing support services, DFCS's investigation focused on whether Ms. Thomas was a fit parent, and that investigation was closed as unsubstantiated. (DE 184-1, pp. 25-26; DE 166, 193:10-12).

Ms. Fowler testified that Mr. Roaden interviewed staff after the school day concluded (DE 169, 17:21-33:12, 70:4-72:9, 144:7-13), but there are no written records or other contemporaneous evidence regarding those interviews, nor of any other actions Mr. Roaden might have taken. (DE 168, 87-88; 153:9-24; 154:16-155:2; 157:8-12). Nevertheless, Ms. Fowler publicly declared, and the district court

---

[12]    DE 184 is the redacted version of the transcript. The unredacted version, DE 131, is sealed.

tacitly agreed, that there were thorough investigations by DFCS, Decatur Police and CSD which determined that the incident did not happen. (DE 168, 235, 240-244; 294; DE 187, 20). Dr. Dude did not wait for investigations to be concluded before telling a concerned father on November 29, 2017, less than two weeks after Ms. Thomas' report, that the "rumor" of a sexual assault was untrue. (DE 168, 113-116; 304-308). According to the district court, these significant factual inconsistencies are not enough to raise a triable issue of material fact.

The district court further attempted to buttress its conclusion that no reasonable jury could find deliberate indifference by mischaracterizing and trivializing Ms. Thomas' evidence or simply concluding that "none of these factual disputes are material to whether there was deliberate indifference." (DE 187, pp. 28-32). The court dismissively characterized Ms. Thomas as "dissatisfied" with the District's "investigation" because "her phone calls to Fowler were not returned and she was not kept apprised of actions taken by CSD." (DE 187, p. 32). "Even if CSD personnel were negligent in not responding to phone messages left by Thomas after the Incident was reported, any such negligence would not approach the standard of deliberate indifference." (DE 187, pp. 32-33). The court further opined that "(w)hile Thomas may take issue with the thoroughness of the investigation based on who was (or was not) interviewed, whether (in her view) she was adequately informed of the investigation, and whether any written records were kept, CSD's chosen

investigative measures do not rise to the level of deliberate indifference to Thomas's report of the sexual harassment." (DE 187, p. 31). Further displaying its mischaracterization of Ms. Thomas' argument, the court cited *Garrett*, 824 F. App'x at 964-65 for the proposition that "Title IX does not grant a victim of student-on-student harassment the right to choose a school's remedial measures," implying that Ms. Thomas was merely dissatisfied with what the court viewed as a reasonable response to her report of a sexual assault of her 5-year-old daughter.

Implicit in the district court's dismissive mischaracterization of Ms. Thomas' claims is its failure to acknowledge the absence of credible, admissible evidence that Defendants or any governmental agency actually conducted a meaningful investigation. The court accepted at face value Defendants' uncorroborated hearsay statements that Mr. Roaden interviewed witnesses and took other actions consistent with an investigation of an alleged student-on-student sexual assault, including Dr. Dude's incredible statement that he knows that there was a thorough investigation of the allegations because he told Mr. Roaden to investigate. (DE 168, 154:16 to 22). When coupled with the findings from OCR that the District's response violated Title IX, the dearth of evidence of an investigation creates genuine issues of fact that are perhaps the most material to Ms. Thomas' Title IX claim—whether the District was deliberately indifferent in its response to Ms. Thomas' report of a sexual assault. The court's contrary conclusion is reversible error.

41

### *2. The district court wrongly relied on the dissimilar Adams case instead of Stinson.*

The district court's finding that Ms. Thomas failed to establish a triable issue of material fact regarding deliberate indifference was based in large part on this Court's unpublished opinion in *Adams v. Demopolis City Schools*, Case No. 22-113117, affirming summary judgment (11th Cir. September 1, 2023). The court's reliance on *Adams* was procedurally and substantively flawed.

*Adams* was decided more than six months after Defendants' motion for summary judgment was fully briefed. (DE 137, filed February 23, 2023). It was impossible for the parties to review and analyze *Adams* in the context of their arguments related to summary judgment. The parties had no opportunity to respond to *Adams* with supplemental briefing. Ms. Thomas was significantly prejudiced by having her claims dismissed based on a decision that was not in existence when she prepared her briefs and to which she was unable to respond.

*Adams* is factually dissimilar to this case in ways that are significant to the question of deliberate indifference, casting doubt on the court's reliance on it to dismiss Ms. Thomas' Title IX claim. Unlike in this case, *Adams* did not involve a sexual assault. Instead, the victim was subjected to psychological and emotional bullying, including repeated uses of a racial epithet, calls for her to kill herself, and some physical touching in the form of pulling her hair and slapping her on the back. *Adams* at *4-*6. As egregious as the abuse was, it is not the same as the reported

42

sexual assault involving physical penetration of 5-year-old Jane Doe's vagina. (DE 166, 30:6-22; 36:16-20). Furthermore, the school defendants responded more substantively to the reported bullying than did Defendants here, including suspending the perpetrator on multiple occasions, developing a safety plan and monitoring interactions between the students. *Adams* at *5. That active and directly responsive conduct meant that no reasonable jury could conclude that the school effectively "did nothing." *See Garrett*, 824 F. App'x at 965 ("In cases where this Court has found potential Title IX liability for student-on-student harassment, the school responded to a report of sexual assault by effectively doing nothing.").

That is not the case here, contrary to the district court's finding. (DE 187, p. 31). The district court pointed to a flurry of activity on the day Ms. Thomas made her report and concluded that constituted an effective and reasonable response. (DE 187, pp. 29-31). However, as OCR concluded:

> (T)he District then took **no further steps** to determine what occurred. Instead, the District involved and deferred to the SRO (school resource officer) and DFCS. The District did not resume investigating when the SRO indicated there would be no further criminal processing due to the age of the children, and the District failed to ascertain anything about DFCS's findings concerning the alleged incident.

(DE 17-1, p.12) (emphasis added). In other words, after an initial burst of activity on the day the report was made, Defendants effectively did nothing. Those findings create a triable issue of material fact sufficient to defeat summary judgment. The

43

district court erred in dismissively rejecting those facts so as to conclude that there was no triable issue.

This Court's decision in *Stinson v. Maye,* 824 F. Appx. 849 (11th Cir. 2020), not *Adams,* should govern the deliberate indifference analysis here. In *Stinson,* the principal downplayed the gang rape of a female student by male students, *Id.*at 853, while here the principal publicly stated that the sexual assault of Jane Doe by John Doe never happened. (DE 169, 235, 240-244; 350). In *Stinson,* school officials called law enforcement but did not conduct an investigation into the gang rape, did not interview or discipline the perpetrators, and made the victim, not the perpetrators, transfer to another school. *Id.* at 854. Here, Defendants called law enforcement and DFCS, have no evidence of an investigation into the assault, did not interview or discipline the perpetrator and made the victim, not the perpetrator, transfer. In *Stinson,* this Court found that "the Board's response to Stinson's report of K.R.'s alleged gang rape was effectively 'an official decision ...not to remedy the violation' of Title IX." *Id.* at 860 (citations omitted). The district court should have made the same conclusion here.

### 3. *The district court erred in not according deference to the Office of Civil Rights' investigative findings.*

The district court disregarded the Supreme Court's long-standing admonition that courts must adhere to the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling

indications that it is wrong. . ..." *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.,* 848 F.2d 1164, 1167-68 (11th Cir. 1988). That admonition applies to OCR interpretations of Title IX. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 647-648 (1999). In *Davis*, the Supreme Court referenced OCR's "recently adopted policy guidelines providing that student-on-student harassment falls within the scope of Title IX's proscriptions" in reaching its conclusion that Title IX includes a private right of action for student-on-student sexual harassment. *Id.*

Rather than according similar deference to the OCR Findings here, the district court trivialized and rejected outright Ms. Thomas' argument that the findings create a genuine issue of material fact with respect to whether CSD was deliberately indifferent. (DE 187 p. 35). In this case, OCR did not merely issue general policy guidelines as in *Davis* but conducted an extensive investigation and issued case-specific findings directly relevant to Ms. Thomas' claims. Under *Davi*s and *Blessitt*, they deserved serious consideration, not a cavalier brush off as immaterial.

The district court attempted to justify its disregard for the OCR findings by wrongly claiming that Ms. Thomas argued that the OCR findings **alone** established "the requisite actual notice and deliberate indifference' needed for Thomas to prevail." (DE 187 p. 35) (emphasis added). Notably, the district court then admits that is not case, and that Ms. Thomas argued that the OCR Findings are "**further evidence** of a 'failure to respond reasonably to an allegation of sexual harassment.'"

(DE 187, p. 35) (emphasis added). The district court contradicted itself in the same paragraph, first chiding Ms. Thomas for purportedly claiming that the OCR Findings alone proved deliberate indifference, then saying that she argued that they were some evidence of failure to respond. Even so, according to the district court, the OCR Findings are immaterial because of the purported "evidence" of an investigation by Defendants and their conclusion that the incident did not happen. (DE 187, p. 35).

As discussed *supra*, the court's conclusion that Defendants conducted an investigation is fatally flawed. Even if it were not, OCR's Findings that no Title IX compliant investigation was conducted, accorded the proper deference, creates a triable issue of fact sufficient to defeat summary judgment. That is particularly true when, as required under *Herzog*, 193 F.3d at 1246, inferences are viewed in the light most favorable to Ms. Thomas. The district court's contrary conclusion is reversible error.

## IV.   The District Court Erred When It Ruled That Plaintiff Failed To Prove Intentional Discrimination And Disparate Impact To Support Her Title VI Claim.

In order to establish a violation of equal protection, a plaintiff must demonstrate that the challenged action was motivated by an intent to discriminate. *Carr v. Bd. of Regents of Univ. Sys. of Ga.*, 249 F. App'x 146, 149 (11th Cir. 2007) (per curiam); *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1406 (11th Cir. 1993). Discriminatory intent may be established by evidence of such factors as:

46

1) substantial disparate impact; 2) a history of discriminatory official actions; 3) procedural and substantive departures from the norms generally followed by the decision-maker, and 4) discriminatory statements in the legislative or administrative history of the decision. *Id*. Here, Appellant has proffered evidence proving the existence of all four factors, establishing discriminatory intent.

### A. The District Court Erred in Disregarding Evidence Regarding Disparate Treatment/Impact.

While Title VI prohibits intentional discrimination, the statute's implementing regulations proscribe actions that result in disparate treatment and actions that negatively impact those protected by the statute. *Young by Young v. Montgomery County*, 922 F. Supp. 544, 549 (M.D. Ala. 1996). Recipients of federal funding, such as CSD, "...may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race." *Id.* (citing 34 C.F.R. § 100.3(b)(2)).

Essential for proper analysis of a Title VI disparate treatment/impact claim is the understanding that such claims derive from cases decided under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e17 (as amended) ("Title VII"). "Elements of a Title VI disparate impact claim under 34 C.F.R. § 100.3(b)(2) derive from cases decided under Title VII… a plaintiff must show by a preponderance of the evidence that a **facially neutral educational practice** has a racially disproportionate adverse effect." *Young* at 549-550 (emphasis added), citing

47

*Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1417 (11th Cir. 1985); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

In *Carr,* the plaintiff established that five white students accused of theft had received lesser sanctions than she (an African-American woman) did. 249 F. App'x at 149. However, the plaintiff did not respond to the university's evidence that factors other than race accounted for the differential punishments. *Id.* This Court concluded that the plaintiff raised no genuine issue of material fact because she failed to present any evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory reasons for her suspension were a pretext for intentional discrimination. *Id.* at 147. Consequently, the court upheld the district court's grant of summary judgment in favor of the university. *Id.* at 150.

Here, Ms. Thomas produced evidence of disparate treatment and impact, based on race by CSD, including a report documenting historical racial disparity in educational opportunities and outcomes for CSD students between 2015 and 2018. (Ex. C, Dude 196:16-197:7, 215:24-216:16; 348-431). Ms. Thomas also presented testimonial evidence of differential and disparate treatment of African-American families compared to Caucasian families by CSD staff. (DE 176,.228:20-229:1; DE 183,71:25-75:15). Ms. Thomas also proffered evidence that Defendants responded differently, regularly, and more substantively to John Doe's white parent than they did to Jane Doe's black parent. Ms. Thomas' repeated requests for accommodations

to ensure Jane Doe's safety were ignored and multiple attempts to speak with Oakhurst and CSD staff went unanswered. (DE 166, 59:18-23; 84:4 to 85:1). By comparison, John Doe's father's calls were answered or returned promptly and his request for accommodations for John Doe were immediately put in place. (DE 169, 247:10-21). Defendants proactively reached out to John Doe's father to offer services to his son, the alleged perpetrator. (DE 169, 253:9 to 254:23). No similar offers were made to Ms. Thomas for her daughter, the alleged victim. (DE 169, 263:6-25). These glaring differences raise a genuine issue of material fact regarding disparate treatment and impact, and attendant discrimination.

### 1. *The district court ignored established precedent when it dismissed Plaintiff's evidence of historical racism In CSD.*

The district court's dismissive treatment of Ms. Thomas' arguments regarding historical evidence of CSD's disparate treatment of African Americans ignores established precedent. The district court's decision rests on its belief that "because there is nothing in the record about any negative academic outcomes or discipline imposed based upon race at the elementary school…Thomas fails to show how an alleged history of racial disproportionality in disciplinary and academic outcomes in middle and high schools relate in any way to the response to the reporting of an alleged sexual assault by a five-year-old in Kindergarten." (DE 187, pp. 41-42). The court's reliance on this distinction ignores long standing precedent.

49

Discriminatory intent may be established by evidence of such factors as substantial disparate impact, **a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and discriminatory statements…**

*Elston*, 997 F.2d at 1406 (emphasis added).

### 2. *The district court disregarded departures from norms evidencing differential treatment.*

The differential treatment of Ms. Thomas compared to John Doe's parents was confirmed in OCR's finding that CSD failed to follow its established grievance procedures when responding to Appellant's report of the sexual assault on her daughter. (DE 168, p. 447). OCR also concluded that CSD violated Title IX regulations in failing to provide a prompt and equitable response to Ms. Thomas' report of the sexual assault. (DE 168, 437-449). The district court dismissively disregarded these findings by stating that mere failure to follow regulations and district policies does not prove disparate treatment. (DE 187 p. 35).

The district court also wholly ignored evidence that CSD personnel acted against child protection protocols when they submitted a child neglect/abuse report about Ms. Thomas, mother of the victim, to DFCS. Mr. Rawlings testified that CSD personnel did not follow child protection protocols for seeking support and services for a victim, as Ms. Jefferson claimed was the purpose for the DFCS report. (DE 184, 166:8-23; DE 184-1, pp. 24-27). Instead, she submitted a report that questioned whether Ms. Thomas—a homeless, African-American single parent—was

50

adequately caring for her child who reported being sexually assaulted by a classmate. (DE 184, 161:7-15; 166:8-23; DE 184-1, pp. 24-27). This evidence of departure from accepted norms of Title IX procedures, as well as CSD Board of Education policies, and CSD's inappropriate reporting of the black parent to DFCS raise legitimate jury questions regarding intentional discrimination on the basis of race.

According to OCR, by failing to follow and implement its own policy, CSD violated Title IX. (DE 17-1, p. 12). OCR concluded that CSD failed to notify its Title IX Coordinator and thereby provide a prompt and equitable response to Ms. Thomas' report of a sexual assault. The district court is required to defer to this finding. *Blessitt,* 848 F.2d at 1167-68. CSD's failure to follow adopted and applicable policy establishes discriminatory intent. *Elston,* 997 F.2d at 1406.

### B. The District Court Disregarded Evidence of Discriminatory Statements.

Appellant also proffered evidence of discriminatory statements in Appellees' response to Ms. Thomas' report of the sexual assault of her daughter. Without having spoken to Ms. Thomas[13] or Jane Doe, within two days of the report, Ms. Jefferson told DFCS case worker Bell that she did not believe the incident actually happened and that Jane Doe was "coached" by Ms. Thomas to make the claim of sexual assault.

---

[13]    Ms. Jefferson was part of a meeting with Ms. Thomas on November 17, 2017 after filing the DFCS report, but did not speak with either Ms. Thomas or Jane Doe individually about the incident.

(DE 171, 135:1-20; 230-233). Ms. Jefferson then told Mr. Bell, "This is why I informed the homeless liaison at our schools to be careful about believing some of *these families*. They are all not really homeless just looking for a quick come up to sue and get some money." (DE 171, 135:1-20; 230-233) (emphasis added). At the time that Ms. Jefferson made the statement, 100 percent of homeless families in CSD were African-American. (DE 176, 179:2 to 180:2). That being the case, it is not possible to consider and view Jefferson's statement as anything but directed at homeless, African American students attending CSD. This, coupled with evidence of racial disparities, is enough to demonstrate intent to discriminate based on race. "Where these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and discriminatory impact…." *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, Civil Action 1:21-CV-05337-SCJ at *458-459; *465 (N.D. Ga. Oct. 26, 2023), citing *Wright v. Sumter County. Bd. of Elections & Registration*, 979 F.3d 1282, 1294 (11th Cir. 2020) (quoting *United States v. Marengo County. Comm'n*, 731 F.2d 1546, 1568 (11th Cir.1984)).

Plaintiff has proffered evidence that creates genuine issues of material fact regarding discriminatory intent on the part of Defendants under the factors described in *Elston*. That being the case, the district court clearly erred in granting summary judgment to Defendants on Plaintiff's Title VI claim.

## CONCLUSION

After wrongfully dismissing the portion of Ms. Thomas' Title IX claim based on implementation of CSD's restroom protocol and depriving Ms. Thomas of the opportunity for full discovery, the district court then penalized her for purportedly not providing sufficient evidence of deliberate indifference to support a Title IX claim by ignoring OCR's findings, ignoring or mischaracterizing evidence and making inferences in favor of Defendants. The court similarly mischaracterized evidence and made inferences in favor of Defendants to wrongly find that Ms. Thomas could not establish a violation of Title VI.

The numerous procedural and substantive errors by the district court require reversal of its decision granting summary judgment to Defendants.

Dated: February 16, 2024

/s/*Mary E. McAlister*
Mary E. McAlister
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
P.O. Box 637
Monroe, VA 24574
770.448.4525
mmcalister@childparentrights.org
Vernadette R. Broyles
Ernest G. Trakas
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
vbroyles@childparentrights.org
etrakas@childparentrights.org
Attorneys for Plaintiff-Appellants

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENT**

This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A), because this document contains 12,950 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), incorporated by reference into Rule 27 and 11th Cir. R. 27-1, because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word in fourteen-point font, Times New Roman.

*/s/ Mary E. McAlister*
MARY E. McALISTER

54

## CERTIFICATE OF SERVICE

I certify that on February 16, 2024, I electronically filed the foregoing with the Clerk of Court using the Eleventh Circuit CM/ECF system which will send notification of filing to all parties of record.

*/s/ Mary E. McAlister*
**MARY E. McALISTER**